STOKER, Judge.
The issues in this automobile accident case are whether the jury clearly erred in assigning 100% fault for the accident to a guest passenger and in failing to award the guest passenger any personal injury damages. We reverse in part and affirm in part.
FACTS
This is a suit filed by Eron Hypolite for personal injury damages arising from a collision between a full size van driven by Mary Champagne, who was driving within the course and scope of her employment with the St. Martin Parish School Board, and an Oldsmobile driven by Jeannette Faulk and owned by Damon Francis. Eron Hypolite was riding as a guest passenger in the Faulk vehicle.
The accident occurred on February 24, 1988 at the “T” intersection of La. Hwy. 31 and Big Apple Road in St. Martin Parish. Big Apple Road formed the top of the “T”. Both vehicles were travelling north on Hwy. 31, with the Faulk vehicle in front of the Champagne vehicle. Just before the intersection, Champagne began passing Faulk on the left. Faulk, unaware of Champagne’s maneuvers, turned left at the intersection onto Big Apple Road. Since Champagne’s passing maneuver had to be completed during a left turn at the intersection, the two vehicles side-swiped.
Eron Hypolite filed suit for her alleged personal injuries resulting from the accident against Champagne, the School Board (the owner of the van driven by Champagne), Nutmeg Insurance Company (the School Board’s liability insurer), Faulk, and Champion Insurance Company (Faulk’s liability insurer). Champion was later replaced by the Louisiana Insurance Guaranty Association (LIGA).
After a trial on the merits, the jury assigned 100% fault to plaintiff Eron Hypol-ite, apparently because she was riding with an unlicensed driver. The jury further found that plaintiff had not sustained any personal injuries in the accident. Plaintiff appeals this judgment.
OPINION

Fault of Eron Hypolite

Plaintiff-appellant, Eron Hypolite, contends on appeal that the jury erred in assessing her with 100% fault for the accident since she was only a guest passenger in the vehicle driven by her cousin, Jeannette Faulk. Hypolite argues that a guest passenger owes no duty to supervise the driver. Faulk and Champagne, the two drivers involved in the accident, argue that Hypolite was negligent in permitting Faulk, an unlicensed driver, to drive in violation of LSA-R.S. 32:52 and in failing to actively supervise her driving.
This court discussed the duty and liability of a guest passenger for an unlicensed driver in Loveday v. Travelers Ins. Co., 585 *685 So.2d 597 (La.App. 3d Cir.1991), writ denied 590 So.2d 65 (La.1991), as follows:
“A guest passenger in an automobile has no duty to supervise the driver. Although some cases have stated that a passenger may be at fault for failing to protest excessive speed, in the ordinary situation a passenger is at the mercy of his driver. Unless there is some other basis for liability, a passenger is entitled to entrust his safety to the driver. Adams v. Security Ins. Co. of Hartford, 543 So.2d 480 (La.1989).
*c * # * * *
“It is long-settled law that a violation of a criminal statute does not automatically create liability in a civil case. Violation of a criminal statute, in this case LSA-R.S. 32:52, which requires the driver of a motor vehicle to be licensed, does not constitute negligence and is not actionable unless the violation bears a causal relation to the accident sued on. In order for the violation of a safety statute to constitute actionable negligence, the violation must be encompassed within the scope of the risks that the statute was designed to protect against, and the violation must be a cause-in-fact of the accident. See Wright v. O’Neal, 427 So.2d 852 (La.1983); Boyer v. Johnson, 360 So.2d 1164 (La.1978); Armour v. Armour, 541 So.2d 371 (La.App. 2d Cir.), writ denied, 546 So.2d 1217 (La.1989); Enlow v. Blaney, 527 So.2d 1178 (La.App. 3d Cir.), writ denied, 532 So.2d 151 (La.1988); McCarroll v. Kinchen, 526 So.2d 484 (La.App. 1st Cir.), writ denied, 532 So.2d 158 (La.1988); Snyder v. Bergeron, 501 So.2d 291 (La.App. 1st Cir.1986), writ denied, 503 So.2d 483 (La.1987); Exnicios v. Miller, 346 So.2d 729 (La.App. 1st Cir.), writ not consid., 349 So.2d 881 (La.1977).
LSA-R.S. 32:52 prohibits an unlicensed driver from driving and prohibits a person from allowing an unlicensed driver to drive any vehicle owned or controlled by him. The intent of this statute, at least in part, is to protect the motoring public as well as the unlicensed driver by preventing inexperienced and incapable persons from operating motor vehicles on public roads. However, if a driver is competent and experienced, although unlicensed, then the risk of allowing him to drive is outside the scope of the risks that LSA-R.S. 32:52 was intended to protect against. As has been noted, “[experienced drivers manage to engage themselves in auto accidents all the time”. Loveday, supra; Armour, supra; and Snyder, supra.
Defendants had the burden of showing that Hypolite’s violation of LSA-R.S. 32:52, in allowing Faulk to drive a vehicle owned by Damon Francis, was a cause of the accident. McCarroll, supra. We find that defendants failed to carry their burden of proof.
Initially, we note that Hypolite neither owned nor controlled the vehicle driven by Faulk. The vehicle was owned by Damon Francis and had been loaned by him to Faulk for her use. Faulk had control of the vehicle. Therefore, Hypolite had no legal duty under LSA-R.S. 32:52 to prevent Faulk from driving the vehicle. The jury clearly erred as a matter of law in holding Hypolite liable for the accident.
Next, we find that Faulk was an experienced, capable driver. She was thirty-five years old, had been driving for about eighteen years, and had done most of her driving in St. Martinville, but had driven a few times to New Iberia and back. Faulk had never been stopped, had never gotten a traffic ticket and had never been involved in an accident prior to the one herein. Faulk had driven Hypolite many times before, although she admitted that Hypolite usually drove. Faulk stated that she considered herself to be a safe, competent driver but had never gotten a license because she was scared to take the written part of the exam. (Faulk had obtained her license as of the time of trial.) Therefore, we see absolutely no basis in the record for the trial jury to have concluded that Faulk was an inexperienced, incompetent driver whom Hypolite should not have “permitted” to drive. A lack of driving experience was clearly not a causal factor in the accident. We note again, however, and emphasize, that Hypolite was not liable in any event under LSA-R.S. 32:52, since the vehicle driven by Faulk was neither owned nor controlled by Hypolite. Hypolite did *686 not have a legal duty to prevent Faulk from driving Francis’ car.
Therefore, the jury erred as a matter of law in assigning any fault for the accident to Eron Hypolite and, accordingly, we reverse that part of the judgment assessing 100% fault to Eron Hypolite. We find that she was not at fault to any degree.
We will pretermit discussion of allocation of fault between the drivers in view of our holding that plaintiff did not sustain damages as a result of the accident, as set forth below.
DAMAGES
Plaintiff argues on appeal that we should award damages for the injuries she sustained in the accident. The trial jury made a specific finding that plaintiff had not sustained any injuries in the accident.
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong”. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Rosell v. ESCO, 549 So.2d 840 (La.1989). Also, Sutler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).
Plaintiff contends that she sustained a traumatic injury to her right knee when it hit the dashboard and that she suffered a cervical strain. Medical testimony was presented that one week prior to the accident plaintiff sustained traumatic injury to her right knee in an accident at home, for which she was treated by Dr. Fournet. Plaintiff’s initial treating physician for the automobile accident was also Dr. Fournet. He testified that he believed the fluid in plaintiff’s knee on February 24,1988 was a result of the accident at home on February 17, 1988. He stated that there was no apparent injury to plaintiff’s knee as a result of the automobile accident.
Dr. Fournet also testified that plaintiff complained of neck and shoulder pain as a result of the accident on February 24,1988. He stated that although he found no objective evidence of a neck injury, plaintiff could have suffered a minor cervical muscle strain. He did not prescribe any medication for the neck strain, although he said that the medication for her knee would also ease a neck strain.
Plaintiff next saw Dr. Romero on February 29, 1988. Dr. Romero prescribed pain reliever for her neck strain and physical therapy for her knee.
Plaintiff was then referred to Dr. Cobb, an orthopedic specialist, on May 4, 1988. Dr. Cobb testified that he treated plaintiff’s knee extensively. However, plaintiff only complained of neck pain to the nurse on her first visit and did not mention it again until January 11, 1989. He found no objective evidence to support plaintiff's complaints of neck pain, but did find, through testing, mild disc protrusions at the L4-5 and C4-5 levels. However, the protrusions did not appear to be pinching any nerves and did not seem to be causing any clinical pain. Dr. Cobb testified that such bulges can be caused by the aging process or by trauma from an automobile accident. They could also have been caused by an incident in September 1986, in which plaintiff was beaten up by a man. She had checked into a hospital after that incident. Dr. Cobb was unable to state what had caused the bulging discs or the neck pain and could not definitely relate these problems to the auto accident.
Finally, Dr. Cobb testified that plaintiff’s knee injury could have been caused by either the fall onto it at home or the automobile accident, and that he could not discern the true cause of the injury.
Dr. Shepherd, an orthopedist, first examined plaintiff on September 16, 1988. Dr. Shepherd testified that the knee injury could have been caused by the accident or by the fall at home. The accident could have exacerbated a prior injury. However, he stated that plaintiff only told him of the auto accident and not of the prior fall at home, although she was specifically asked *687 if she had had any problems with her knee prior to the auto accident. Dr. Shepherd had a Lido test administered by John Roy, a physical therapist, on April 24, 1989, to objectively measure the strength and range of motion of plaintiffs knee. The test is computerized and can detect attempts to trick the machine through erratic responses. Plaintiffs test results showed “zero” effort on her part and indicated that she was not being cooperative. Roy testified that since plaintiff was able to walk she could have performed the test to some degree. Dr. Shepherd said that it was possible, although not certain, that plaintiff had been magnifying her complaints. Dr. Shepherd last saw plaintiff on May 10, 1989, when he recommended further testing.
Dr. McDaniel, an orthopedic surgeon, testified as to the results of his examination of plaintiff, and her prior test results, on November 30, 1988. Dr. McDaniel stated that he did not believe the chondromala-cia in plaintiffs knee had been caused by the accident, but was rather, a problem common to young women of plaintiffs height and weight. He also stated that plaintiff had not informed him of any problems with her knee prior to the automobile accident although she had been specifically asked. In his opinion, plaintiff was exaggerating her complaints. However, violent trauma to the knee can cause chondromala-cia, although, in plaintiffs case, the automobile accident was apparently not the originating point of the chondromalacia. Dr. McDaniel also noted that in order for plaintiffs knees to strike the dashboard, the car must have either hit something in front of it or stopped suddenly. However, plaintiff testified that the car was rear-ended and side-swiped by Champagne’s van.
Finally, we note that plaintiff testified that she was involved in an automobile accident in 1984 which resulted in minor injuries to her back and neck.
We hold that the jury, as the finder of fact, did not clearly err in finding that plaintiff did not sustain any injuries as a result of the accident. There is sufficient evidence to support this conclusion. Therefore, the award of -0- damages to plaintiff is affirmed.
CONCLUSION
For the reasons given, the judgment of the trial court is reversed in part, so as to assign no fault to plaintiff-appellant Eron Hypolite. The judgment of the trial court is affirmed as to the award of no damages to Eron Hypolite. Costs of this appeal are assessed one-third to plaintiff-appellant; one-third to appellees Mary Champagne, St. Martin Parish School Board and Nutmeg Insurance Company; and one-third to Jeannette Faulk and LIGA.
REVERSED IN PART and AFFIRMED IN PART.